**FILED**

4-15-13

APR 15 2013

AO 91 (REV.5/85) Criminal Complaint

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Joel M. Hammerman (312) 353-8881
AUSA Ryan S. Hedges      (312) 353-5340
AUSA Terra Reynolds      (312) 353-3148

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KENNETH NAVE

**CRIMINAL COMPLAINT**

CASE NUMBER 13 CR 313

**UNDER SEAL**

MAGISTRATE JUDGE MARTIN

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about December 7, 2012, at Chicago, in the Northern District of Illinois, Eastern Division, KENNETH NAVE, defendant herein:

did knowingly and intentionally, in the course of the distribution of a controlled substance, namely a quantity of a mixture and substance containing hydrocodone, a Schedule III Controlled Substance, use the DEA registration number of Physician I;

in violation of Title 21, United States Code, Section 843(a)(2). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
CATHY A. BARBOUR
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

April 15, 2013
Date

at

Chicago, Illinois
City and State

4/15/13

Daniel G. Martin, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT    )
                                      )    ss

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Cathy A. Barbour, being duly sworn, state as follows:

### I.    Background of Affiant

1.    I am a Special Agent of the Federal Bureau of Investigation and have been so for approximately fifteen years. My responsibilities as an FBI Special Agent include the investigation of health care fraud and related white collar crimes. I have received specialized training and have conducted numerous health care fraud investigations. Along with other federal agents, I am responsible for the investigation of the executives, administrators and physicians associated with West Side Community Hospital, Inc., doing business as Sacred Heart Hospital.

### II.    Basis and Purpose of Affidavit

2.    The information contained in this Affidavit is based on my training and experience, my participation in this investigation, information that I have obtained from other federal agents and officers involved in this investigation,[1] and information derived from other sources that I believe to be reliable, including: witness interviews,

---

[1] In particular, the FBI is being assisted in this investigation by Special Agents of the United States Department of Health and Human Services, Office of Inspector General, and Investigators of the Drug Enforcement Administration.

consensually recorded conversations of cooperating sources,[2] insurance claims data, records maintained by the Drug Enforcement Administration, public records, and financial documents.

3.  This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that on or about December 7, 2012, DR. KENNETH NAVE did knowingly and intentionally, in the course of the distribution of a controlled substance, namely a quantity of a mixture and substance containing hydrocodone, a Schedule III Controlled Substance, use the DEA registration number of Physician I,[3] in violation of Title 21, United States Code, Section 843(a)(2).

4.  This affidavit is also submitted in part for the limited purpose of establishing probable cause to support an application for the issuance of a warrant to search areas of Sacred Heart, which is a hospital located at 3240 West Franklin Boulevard in Chicago, Illinois, which areas are described in greater detail in

---

[2] This Affidavit includes summary descriptions of consensually-recorded telephone and in-person conversations. These summaries are based on my review of the recordings, draft transcripts, interviews with cooperating sources, my experience as a law enforcement agent and the experience of other law enforcement officers in this investigation, as well as information learned as a result of the investigation to date. Any descriptions and/or quotations from recorded conversations come from draft, not final, transcripts and summaries of those conversations. At various points in this Affidavit, I have placed in brackets or parentheses my understanding of what was being said during those conversations. My understanding is based on the contents and context of the conversations and the investigation as a whole, my conversations with cooperating sources, my experience as a law enforcement agent, and the experience of other law enforcement agents and officers in this investigation.

[3] According to records from the Illinois Department of Financial and Professional Regulation and the DEA, Physician I is a physician licensed to practice medicine and prescribe controlled substances in Illinois, and is registered with the DEA to prescribe controlled substances, including hydrocodone.

Attachment A, for evidence and instrumentalities, which are described in greater detail in Attachment B, relating to violations of Title 21, United States Code, Sections 846 (conspiracy to possess and distribute controlled substances), 841(a)(1) (possession and distribution of controlled substances), and 843(a)(2) (use of a DEA registration number issued to another person in the course of distributing a controlled substance).

5.    Because this affidavit is submitted only for these limited purposes, it does not set forth each and every fact I know about this investigation.

### III.    Summary of the Investigation

6.    The FBI is investigating individuals associated with Sacred Heart, an acute care hospital located on Chicago's west side. As described in detail below, the investigation has revealed that beginning no later than in or around November 2012, and continuing until at least on or about February 25, 2013, NAVE issued prescriptions to patients at Sacred Heart for controlled substances using the DEA registration number issued to another person, Physician I. For example, on or about December 7, 2012, NAVE issued a prescription to a patient with the initials G.T. for 90 pills containing a mixture and substance containing hydrocodone, a Schedule III Narcotic Drug Controlled Substance, using Physician I's DEA registration number.

7.    In February 2012, Administrator B, who is employed as a member of Sacred Heart's senior executive staff, agreed to cooperate in the government's investigation. According to Administrator B, her responsibilities at Sacred Heart include overseeing medical clinics associated with the hospital as well as managing the hospital's marketing staff and transportation services. Administrator B has explained

3

that she reports directly to Administrator A and, ultimately, to Edward Novak, the hospital's owner and Chief Executive Officer.

8.     Investigating agents first approached Administrator B concerning allegations that she was soliciting kickbacks for the referral of durable medical equipment and pharmaceutical prescriptions ordered for patients insured by Medicare. Administrator B acknowledged her solicitation and receipt of kickbacks and agreed to cooperate with the government's investigation.[4]

9.     At investigating agents' request and direction, Administrator B has consensually recorded a number of meetings and telephone calls with Sacred Heart executives, administrators, physicians and employees.[5]

10.     In January 2013, Administrator A, who is also employed as a member of

---

[4] Prior to agreeing to cooperate in the investigation, Administrator B was consensually recorded offering to pay kickbacks for the referral of Medicare patients to Sacred Heart. Administrator B was also recorded accepting payments from a confidential source in return for her referral of prescriptions for Medicare and Medicaid patients to a durable medical equipment supply company. In interviews with investigating agents, which were subject to the terms of a proffer agreement, Administrator B admitted accepting cash payments (totaling thousands of dollars) and other compensation for pharmaceutical and durable medical equipment referrals. Administrator B further admitted accepting cash payments (totaling thousands of dollars) for referring Medicare patients to home health care agencies not affiliated with Sacred Heart. In her interviews, Administrator B has made certain statements which she has subsequently acknowledged were not accurate. Other than the proffer agreement, the government has not made any promises or assurances to Administrator B in connection with her assistance in this investigation. Administrator B is cooperating with the hope that her cooperation will be considered in any charging decisions made in connection with this investigation and, if Administrator B is charged and convicted, by a court at the time of sentencing. Administrator B has never been arrested or convicted of a crime.

[5] With Administrator B's consent, the government obtained judicial authorization pursuant to 18 U.S.C. § 2511(2)(a)(ii)(A) to record the communications to and from a cellular telephone used by Administrator B. Pursuant to that authorization, law enforcement consensually recorded communications to and from Administrator B's cellular telephone from in or around March 3, 2012, through in or around September 15, 2012.

Sacred Heart's senior executive staff, agreed to cooperate in the government's investigation.[6] Administrator A has described his responsibilities at Sacred Heart to include: (1) general oversight of the hospital's operations; (2) increasing patient admissions to the hospital by recruiting physicians willing to refer Medicare-insured patients to the hospital in return for kickbacks; and (3) instituting and maintaining processes that facilitate the admission of paid-for patient referrals to the hospital. According to Administrator A, he takes direction from and reports directly to Novak.

11.    At investigating agents' request and direction, Administrator A has assisted in the investigation by, among other things, making consensual video and audio recordings of in-person and telephone conversations with other Sacred Heart executives, administrators, physicians, and employees, some of which are described

---

[6] Prior to agreeing to cooperate in the investigation, Administrator A was consensually recorded offering to pay, and in at least one instance, paying kickbacks, to physicians in return for their referral of patients to Sacred Heart. Administrator A was also consensually recorded directing that Sacred Heart physicians not interfere with the admission of other physicians' patient referrals to Sacred Heart, irrespective of the perceived lack of medical necessity for those admissions. Administrator A was further recorded directing physicians and others to use the hospital's emergency room unnecessarily to observe and admit patients to Sacred Heart. Administrator A's interviews with law enforcement agents were subject to the terms of a proffer agreement. In those interviews, Administrator A has made certain statements which he has subsequently acknowledged were not accurate. Other than the proffer agreement, the government has not made any other promises or assurances to Administrator A in connection with his assistance in this investigation. Administrator A is cooperating with the hope that his cooperation will be considered in any charging decisions made in connection with this investigation and, if Administrator A is charged and convicted, by a court at the time of sentencing. Administrator A has never been arrested or convicted of a crime.

below.[7]

## IV.  NAVE's Issuance of Prescriptions for Controlled Substances Without a License or Registration

12.    According to the Illinois Department of Financial and Professional Regulation's website, DR. KENNETH NAVE is a physician who has been licensed to practice medicine in Illinois since 1999.  The website reflects that NAVE's license was suspended between March 5, 2002, and June 18, 2008, and that NAVE is currently on probation.

13.    I am aware that under Illinois law, a physician must obtain a license from the Illinois Department of Financial and Professional Regulation in order to prescribe controlled substances.  I am further aware that under federal law and regulations, a physician may only issue a prescription for a controlled substance if he is: (1) authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice medicine; and (2) registered with the Drug Enforcement Administration to prescribe controlled substances.[8]  Although there are certain exceptions to the requirement that a physician register with the DEA to prescribe controlled substances, those exceptions still require that the physician be authorized to prescribe controlled

---

[7] With Administrator A's consent, on or about February 21, 2013, and March 21, 2013, the government obtained judicial authorization pursuant to 18 U.S.C. § 2511(2)(a)(ii)(A) to record the communications to and from a cellular telephone used by Administrator A.  Law enforcement has consensually recorded communications to and from that cellular telephone since about February 22, 2013.

[8] I am aware that upon successfully registering with the DEA to prescribe controlled substances, the DEA issues the registering physician a DEA registration number unique to that physician.  The physician must include the DEA registration number on any prescription for a controlled substance the physician issues.

substances by the jurisdiction in which he is licensed to practice.

14.     According to the Illinois Department of Financial and Professional Regulation officials, NAVE received a license from the State of Illinois to prescribe controlled substances on August 17, 1999. Those records further show that on March 5, 2002, the Illinois Department of Financial and Professional Regulation suspended NAVE's license to prescribe controlled substances, and did not reissue that license until February 26, 2013. I am aware that during the time that NAVE's state license to prescribe controlled substances was suspended, NAVE was not authorized to issue prescriptions for controlled substances. According to records from the DEA, at all times relevant to this complaint, NAVE has not been registered with the DEA to prescribe controlled substances. DEA records show that on March 6, 2013, NAVE applied for his DEA registration to prescribe controlled substances. NAVE's DEA registration application is pending.

15.     On September 28, 2012, Administrator B consensually recorded a meeting with Administrator A and NAVE regarding Sacred Heart's interest in recruiting NAVE to practice medicine at the hospital. During that meeting, NAVE disclosed that he was suspended from the practice of medicine between 2002 and 2008, and was on probationary status. NAVE falsely told Administrators A and B that his Illinois controlled substance license had been reinstated the previous week and that he therefore had "prescribing privileges." Because NAVE's Illinois controlled substance license was suspended until February 26, 2013, NAVE did not have prescribing privileges on September 28, 2012.

7

16.     During the same meeting, NAVE stated that his registration to prescribe controlled substances with the DEA "is inactive." In fact, NAVE did not have his own DEA registration number at the time. NAVE stated that he does not have "a DEA [registration] number" to prescribe controlled substances. NAVE explained that he usually works with other doctors in those instances in which narcotics need to be prescribed to a patient. According to Administrator A and Administrator B, they understood NAVE to be saying that, if necessary, NAVE had other doctors with whom he worked write any prescriptions for NAVE's patients for controlled substances. NAVE explained that he would be working with Physician I at Sacred Heart.[9] According to Administrator A and Administrator B, they understood that Physician I would be responsible for prescribing controlled substances to NAVE's patients at Sacred Heart. Administrator A and Administrator B expressed their interest in having NAVE and Physician I work at Sacred Heart, and asked NAVE to provide the appropriate paperwork to the hospital. NAVE agreed to do so.

17.     According to Administrator A, on October 29, 2012, Sacred Heart's credentialing committee granted NAVE temporary privileges to treat patients at the hospital for a period not to exceed 120 days. Administrator A said that upon the expiration of that 120-day period, Sacred's Heart's credentialing committee extended NAVE's provisional privileges. According to Administrator A, on or shortly after October 29, 2012, Sacred Heart's credentialing committee also granted Physician I

---

[9] According to Administrator A and Administrator B, they do not know if Physician I is one of the physicians with whom NAVE previously worked.

privileges at Sacred Heart.

18.     On February 11, 2013, Administrator A had a consensually recorded conversation with Sacred Heart's CEO, in which the CEO asked "is that guy [Physician I] actually coming in and writing [controlled substance] orders or is NAVE writing all the [controlled substance] orders?"  Administrator A responded that he had seen "[Physician I] in [Sacred Heart] about a half dozen times" during the course of NAVE's work at the hospital.  The CEO explained that he was asking Administrator A "because NAVE . . . can't be writing all these [controlled substance] orders or you know somebody's gotta co-sign for him."  The CEO instructed Administrator A to "make sure this guy, [Physician I]'s, coming in . . . 'cause I don't think legally NAVE can give orders [for controlled substances]."  Administrator A said he would do so.

19.     Administrator A had another consensually-recorded meeting with Sacred Heart's CEO on February 20, 2013.   During that meeting, the CEO asked Administrator A if Physician I had privileges to treat patients at Sacred Heart.  Administrator A responded "yes."  The CEO said that NAVE is not registered with the DEA to prescribe controlled substances.  Administrator A confirmed NAVE's lack of DEA registration and stated, "I think [NAVE's] got to go to [Physician I] and [Physician I]'s gotta write the [pre]script[ion] for controlled substances."  The CEO asked Administrator A to look into the matter.  Administrator A said he would do so.

20.    On March 4, 2013, the Centers for Medicare and Medicaid Services[10] and the State of Illinois initiated an unannounced survey in which they reviewed Sacred Heart policies, procedures, and medical performance. That afternoon, Administrator A and Sacred Heart's CEO had a consensually-recorded conversation in which they discussed NAVE's issuance of prescriptions for controlled substances. During that conversation, the CEO told Administrator A: "What I'm worried about is [the surveyors] pulling the doctors' files." The CEO explained, "I hope that NAVE wasn't writing any orders [for controlled substances] . . . I hope it was legal whatever [NAVE and Physician I] were doing."

21.    Later in the afternoon on March 4, 2013, Administrator A had a consensually-recorded conversation with NAVE. Administrator A told NAVE that Sacred Heart's CEO wanted to know how NAVE was "writing or charting for a narcotic on a patient." NAVE did not respond at that time to the CEO's question. NAVE responded that his "controlled substance license came in [from the Illinois Department of Financial and Professional Regulation]," but that NAVE had not delivered the license to Sacred Heart.

22.    On March 7, 2013, Administrator A had a consensually-recorded telephone conversation with NAVE. During the call, Administrator A said Sacred Heart's CEO wanted Administrator A "to find out if you are writing orders for narcotics [controlled substances] on patients." NAVE responded: "I am for those patients who

_____

[10] Medicare is administered by CMS, an agency of the Department of Health and Human Services.

require it." NAVE said: "My understanding . . . I don't have a DEA number, [but] since me and [Physician I] are in practice together, I can prescribe through [Physician I] and it's an understood approval . . . because we work in the same practice." NAVE claimed that "[i]f there was any wrongdoing, it was an ignorance, [and] not an intent, for sure."

23.     Minutes later, Administrator A had another consensually-recorded telephone conversation with NAVE, in which Administrator A asked, "is [Physician I] coming into the hospital to see patients?" NAVE responded, "No . . . [Physician I] is suffering from a gastroenteritis that has been chronic. It's affected his ability to work. He hasn't been going into the field as regularly, like working three days a week. He prefers that I handle the hospital until he gets better. So that's kind of how it was. So he came in twice, no, one weekend, five consecutive days around November. After that, he said it was too much on him." Administrator A then asked NAVE, "When was the last time [Physician I] was at the hospital?" NAVE stated, " I think in November." Administrator A remarked, "Oh, wow. You've got to be kidding me." NAVE stated, "No . . . he's been sick. He's working with me but it's mostly close to his home. I don't think there was an intentional oversight . . . he's not preferred to be in the hospital [sic]." NAVE then told Administrator A: " I'll meet with you tomorrow, and you can tell me how to address the records."

24.     Later that day, Administrator A had a consensually-recorded meeting with NAVE and Sacred Heart's CEO. At the outset of the meeting, NAVE stated: "I know there is a problem." The CEO explained that Sacred Heart "brought you on with temporary privileges, and [Physician I] was supposed to be writing all the orders [for

controlled substances]." NAVE responded, "Right." The CEO asked NAVE if that was what was happening. NAVE responded, "Not exactly." The CEO then asked NAVE: "You don't have a DEA or nothing? You ain't been writing for controlled substances?" NAVE responded, "This is how we [NAVE and Physician I] do it in the practice."

25.    During the same March 7, 2013 conversation, the CEO told NAVE: "You're writing [prescriptions] for stuff [controlled substances] you don't have a license for." NAVE responded: "This is what my understanding was at the time. [Physician I] and me were going to work together. Any narcotics [controlled substances] would go through [be written under] his [Physician I]'s DEA number. That's what we do in the field." The CEO told NAVE: "You can't do that here [at Sacred Heart]. He's got to sign for it." NAVE repeated the CEO's statement: "[Physician I]'s got to sign every narcotic [controlled substance prescription]." The CEO told NAVE: "You can't write for [controlled substances]."

26.    NAVE asked the CEO what he wanted to do moving forward, "cause I can't change those past four months [when NAVE was writing prescriptions for controlled substances under Physician I's license]." NAVE explained that he still did not have a DEA registration number, and "just got" his controlled substance license from the Illinois Department of Financial and Professional Regulation "three days ago."

27.    The CEO instructed NAVE: "From now on, [Physician I]'s got to do everything. . . . Otherwise you're going to have a problem. You've already got the two strikes against you [due to the previous suspensions of NAVE's medical and controlled

12

substance licenses]. You know what I mean?" NAVE responded, "I got you." NAVE stated that he did not know if he could get [Physician I] to Sacred Heart every day. The CEO told NAVE to find someone else to cover NAVE's cases at Sacred Heart. The CEO explained that NAVE could "[c]ome and see the patients, shake their hands and everything, but don't do any writing [of prescriptions or in patient charts]." NAVE responded, "Okay." The CEO emphasized that NAVE was not to write in any Sacred Heart patient charts "until you get the DEA [registration number]." At the close of the conversation, the CEO instructed NAVE "to keep a low profile." NAVE said that he would "talk to [Physician I] tonight," and would separately attempt to "fast track" his own DEA registration.

28. According to records from the Centers for Medicare and Medicaid Services, between November 1, 2012 and February 25, 2013, a person using Physician I's name and DEA registration number issued approximately 101 prescriptions for controlled substances to approximately 33 patients at Sacred Heart hospital. Based on NAVE's own admissions during consensually recorded conversations, I believe that NAVE was the person writing prescriptions under Physician I's name and DEA registration number. More specifically, according to records from CMS and the DEA, on or about December 7, 2012, a person using Physician I's name and DEA registration number issued a prescription to a patient with the initials G.T. for 90 pills containing a mixture and substance containing hydrocodone, a Schedule III Controlled Substance, using the name and DEA registration number of Physician I. Based on NAVE's own admissions during consensually recorded conversations, I believe that NAVE was the person who

13

wrote the prescription on December 7, 2012, to patient G.T using Physician I's DEA registration number. According to records from the DEA, the December 7, 2012 prescription to G.T. was filled on December 7, 2012, at a pharmacy in Chicago.

29.     On the morning of April 12, 2013, DEA investigators attempted to speak with Physician I at Physician I's residence in the Chicago area regarding Physician I's DEA registration number. Upon reaching the front door of Physician I's residence, the investigators knocked on the door and announced their office. The investigators saw Physician I walk towards the door, look towards the investigators, and then turn back. A woman later identified as Physician I's wife answered the door. Physician I refused to speak with the investigators.

## V.     Documents and Records to be Seized Regarding NAVE's Distribution of Controlled Substances Maintained at Sacred Heart

30.     Based on my training and experience, my familiarity with this investigation, and for the reasons identified below, I believe that evidence and instrumentalities of criminal activity, namely violations of Title 21, United States Code, Section 846 (conspiracy to possess and distribute controlled substances), Title 21, United States Code, Section 841(a)(1) (possession and distribution of controlled substances), and Title 21, United States Code, Section 843(a)(2) (use of a DEA registration number issued to another person in the course of distributing a controlled substance), are located at Sacred Heart. Based on the foregoing information, I believe that the evidence and instrumentalities may include:

a. Credentialing committee meeting minutes, including audio recordings thereof;

b. Administrative files, including licensing and credentialing information, for NAVE and Physician I; and

c. Patient files for those patients to whom Physician I purportedly prescribed controlled substances between October 29, 2012, and mid-March 2013, the period of time NAVE and Physician I were credentialed to practice at Sacred Heart.

31. According to Administrator A, at the time that NAVE and Physician I obtained privileges to treat patients at Sacred Heart, the hospital's credentialing committee audio-recorded their meetings in order to allow a hospital employee to later record the content of those meetings in official written minutes. According to Administrator A, Sacred Heart's CEO currently possesses at least some of the credentialing committee meeting minutes and NAVE's credentialing file. During an April 9, 2013 consensually-recorded conversation in the CEO's office, the CEO told Administrator A that the CEO was going to eliminate NAVE's name from the credentialing committee meeting minutes. The CEO showed Administrator A a binder labeled "2009 Credentialing Committee Meeting Minutes," but explained that the binder was mislabeled and contained the credentialing committee meeting minutes from 2013. The CEO also held up NAVE's credentialing file, laughed, and told Administrator A that NAVE's "file has disappeared." Administrator A understood this to mean that the CEO intended to eliminate NAVE's name from the credentialing

committee meeting minutes and cause NAVE's credentialing file to disappear in order to make it appear that Sacred Heart never granted privileges to NAVE. According to Administrator A, Administrator A subsequently e-mailed Physician F and Employee E and instructed them to remove NAVE's name from the credentialing committee meeting minutes. According to Administrator A, the CEO maintains an office in the executive suite located in the southeast corner of the first floor of the hospital. The CEO's office occupies the northeast corner of the executive suite, and has a window facing North Sawyer Avenue.

32.     According to Administrator A, the medical staff director, Employee E, maintains the remaining administrative files for NAVE and Physician I, including licensing and credentialing information, meeting minutes of the hospital's credentialing committee, and audio recordings of these meetings. Administrator A stated that Employee E occupies the office west of the CEO's assistant's office in the executive suite of the hospital. According to Administrator A, Employee A has a computer in her office and recently told Administrator A that she has files pertaining to NAVE and Physician I on her computer.

33.     According to Administrator A, following NAVE's departure from Sacred Heart in mid-March 2013, the CEO instructed Administrator A to have a staff member review at least some of the files for patients whom NAVE treated, including the prescription of controlled substances. Administrator A explained that Employee H has been tasked with the responsibility of reviewing those files. Administrator A understands that, among other things, Employee H is responsible for determining

whether Physician I actually prescribed any of the prescriptions for controlled substances issued under his name and DEA registration number. Administrator A understands Employee H is reviewing the patient files in her office, which is an office along the northeast side of the first floor of the hospital.

34. According to Administrator A, the remaining files of patients for whom Physician I purportedly issued prescriptions for controlled substances are stored in a large "central supply" area occupying most of the east side of the hospital's Golden L.I.G.H.T. clinic. The hospital also stores hospital patient medical records in the large "medical records" area that occupies about half of the west side of the Golden L.I.G.H.T. clinic space. Administrator A also knows that Sacred Heart has begun the process of having hospital staff document patient files by computer.

**B. The Search of Computer Systems**

35. Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to

17

examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

36. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

37. In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crimes and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

18

**C.      Procedures to Be Followed in Searching Computers**

38.      The warrant sought by this Application does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure.  Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

39.      With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

        b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

19

c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

e.     scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

f.     performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

40.     Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## VI.     CONCLUSION

41.     Based upon the information set forth above, there is probable cause to support a criminal complaint charging that on or about December 7, 2012, DR. KENNETH NAVE, did knowingly and intentionally, in the course of the distribution of a controlled substance, namely a quantity of a mixture and substance containing hydrocodone, a Schedule III Controlled Substance, use the DEA registration number of Physician I, in violation of Title 21, United States Code, Section 843(a)(2).

20

42.    Based upon the information set forth above, there is also probable cause to support an application for the issuance of a warrant to search Sacred Heart Hospital, which is described in greater detail in Attachment A, for evidence and instrumentalities relating to violations of Title 21, United States Code, Section 846 (conspiracy to possess and distribute controlled substances), Title 21, United States Code, Section 841(a)(1) (possession and distribution of controlled substances), and Title 21, United States Code Section 843(a)(2) (use of a DEA registration number issued to another person in the course of distributing a controlled substance).

FURTHER AFFIANT SAYETH NOT

_____
CATHY A. BARBOUR
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed and sworn
before me this 15th day of April, 2013

_____
HONORABLE DANIEL G. MARTIN
UNITED STATES MAGISTRATE JUDGE

21

## ATTACHMENT A

The following areas of Sacred Heart Hospital, a four-story yellow brick building located at 3240 West Franklin Boulevard, Chicago, Illinois:

- The offices of the Sacred Heart CEO and Employee E in the executive suite located in the southeast corner of the first floor of the hospital.

- The "central supply" area occupying most of the east side of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- The "medical records" area that occupies about half of the west side of the Golden L.I.G.H.T. clinic space in the northwest quadrant of the first floor of the hospital.

- The office of Employee H, the westernmost office along the northeast side of the first floor of the hospital



**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violations of Title 21, United States Code, Sections 846, 841(a)(1), and 843(a)(2), in any form or container, including electronic or digital files residing on computers and other data storage devices, for the period from September 2012 to the present, as follows:

1. Meeting minutes and any notes, agendas, outlines, powerpoint presentations, or other documents reflecting the substance of meetings of the credentialing committee.

2. Audio and video recordings of any meetings referenced in Paragraph 1 above.

3. Patient medical records of those patients for whom Physician I purportedly prescribed controlled substances. These records will include patient names and identifiers, dates of care, care provided, and the names of individuals providing or authorizing care. By separate motion filed under seal, the government will submit a list of the patient medical records that it intends to seize from the relevant subject premises.

4. Items relating to communications between NAVE and Sacred Heart representatives.

5. Items relating to communications between Physician I and Sacred Heart representatives.

## ADDENDUM TO ATTACHMENT B

This warrant does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure. Rather this warrant authorizes the removal of computers and related media so that they may be searched in a secure environment. The search shall be conducted pursuant to the following protocol:

With respect to the search of any computers or electronic storage devices removed from the premises described in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set

forth herein;

  d. opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

  e. scanning storage areas to discover data falling within the list of ems to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

  f. performing key word searches through all electronic storage media to determine whether occurrences of language contained in such storage media exist that are likely to appear in the evidence described in Attachment B.

  The government will return any computers or electronic storage devices removed from the premises described in Attachment A hereto within 30 days of the removal thereof, unless contraband is found on the removed computer and/or electronic storage device, or unless otherwise ordered by the Court.